UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JANE DOES I, II, III and FRIENDS OF FARMWORKERS, INC. D/B/A JUSTICE AT WORK IN ITS CAPACITY AS EMPLOYEE REPRESENTATIVE,<br><br>Plaintiffs,<br><br>v.<br><br>EUGENE SCALIA, IN HIS OFFICIAL CAPACITY AS UNITED STATES SECRETARY OF LABOR; OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION, UNITED STATES DEPARTMENT OF LABOR,<br><br>Defendants. | Case No.: _____<br><br>**COMPLAINT AND EMERGENCY PETITION FOR EMERGENCY MANDAMUS RELIEF** |

## INTRODUCTION

1.     Pursuant to 29 U.S.C. § 662(d), Plaintiffs bring this action for emergency mandamus relief to compel the Occupational Safety and Health Administration ("OSHA") through the Secretary of Labor, to protect workers at the Maid-Rite Specialty Foods meatpacking plant in Dunmore, PA (the "Plant") from the imminent dangers posed by a workplace that has failed to take the most basic precautions to protect against the spread of COVID-19. While OSHA enforcement actions can take years, 29 U.S.C. § 662(a) empowers the Secretary of Labor to

1

seek a court order to alleviate imminent dangers, and 29 U.S.C. § 662(d) authorizes

workers and their representatives to compel the Secretary to use that power where

he has arbitrarily and capriciously failed to do so.

2.     Maid-Rite Specialty Foods ("Maid-Rite") is a privately owned

institutional food services provider. It produces pre-portioned frozen meat products

for schools, universities, nursing homes, and military bases. For instance, it has an

ongoing contract with Fairfax County Public Schools in Virginia. Maid-Rite has

also contracted with public schools in Ohio, Orlando, Florida, and Houston.

3.     Maid-Rite produces lunchroom meat under conditions that pose an

imminent danger to the workers through the risk of death or serious harm from

Maid-Rite's failure to take basic precautions to protect workers from the spread of

COVID-19 at the Plant. Instead, perhaps in an effort to reduce its costs, Maid-Rite

has adopted policies and practices that substantially increase the risks of spread of

disease.

4.     Through the practices it has adopted at the Plant, Maid-Rite has

violated and is continuing to violate its duty to provide a place of employment free

from recognized hazards that are likely to cause death or serious harm to its

workers. These practices include failing to provide cloth face coverings,

configuring the production line in such a way that workers cannot social distance,

failing to arrange for social distancing in other areas of the plant, failing to provide

2

adequate handwashing opportunities, creating incentives for workers to attend work sick, failing to inform workers of potential exposures to COVID-19, and rotating-in workers from other facilities in a way that increases the risk of spreading the virus.

5.      To state the obvious, Maid-Rite can alter these dangerous practices if it will simply assume the costs. For instance, workers on a meat production line can be spaced far enough to allow for safe social distancing if the company either reduces the line's speed or places less meat on the line moving at the same speed. This would enable employees to separate as the number of individual tasks required to be performed at the same time would be reduced. It would also allow some of the people working on the line to take on a support role, taking the place of line workers when needed and thereby enabling line workers regular breaks to care for their personal hygiene.

6.      OSHA knows what it takes to keep workers safe in meatpacking plants. In fact, it has said so in guidance released in conjunction with the CDC. Implementing safety measures may require plants to reduce production, but OSHA's responsibility is to protect workers, not to safeguard profits at the cost of worker injury and death.

7.      OSHA also knows about the substantial breaches of Maid-Rite's duties to protect its workers "from recognized hazards that are causing or are likely

to cause death or serious physical harm to . . . employees." 29 U.S.C. § 654(a)(1).

8.     In fact, OSHA has known about these hazards and Maid-Rite's failure

to mitigate them for more than three months.

9.     In an administrative complaint filed with OSHA in early April, a

worker at the Plant, who was not represented by Friends of Farmworkers, Inc.

d/b/a Justice at Work ("Justice at Work") or any of the undersigned counsel, told

OSHA that because of Maid-Rite's failure to protect its workers from COVID-19

"I'm scared to go to work everyday I'm risking my life[.] . . . [I]t's sad and scary[.]

I'm sorry." Ex. 1 at 40 (April Complaint). OSHA dismissed the complaint based

on Maid-Rite's assurances that things inside the Plant were not so bad.

10.     On May 19, 2020, without knowledge of the complaint filed in early

April, Plaintiffs filed their own administrative complaint with OSHA (the

"Imminent Danger Complaint") asserting that the workers confront an "imminent

danger" in the workplace based on many of the same workplace hazards identified

in the early April administrative complaint. Ex. 2 ¶ 3 (Declaration of Alia Al-

Khatib ("Al-Khatib Decl.")); Ex. 2-A (Plaintiffs' Imminent Danger Complaint).

11.     The Imminent Danger Complaint met all the requirements of a formal

imminent danger notice, as laid out by the Occupational Safety and Health Act

("OSH Act"), 29 U.S.C. § 651, *et seq. See* 29 U.S.C. § 657(f)(1) ("Any employees

or representative of employees who believe that a violation of a safety or health

standard exists that threatens physical harm, or that an imminent danger exists, may request an inspection by giving notice to the Secretary or his authorized representative of such violation or danger. Any such notice shall be reduced to writing, shall set forth with reasonable particularity the grounds for the notice, and shall be signed by the employees or representative of employees, and a copy shall be provided the employer or his agent no later than at the time of inspection, except that, upon the request of the person giving such notice, his name and the names of individual employees referred to therein shall not appear in such copy or on any record published, released, or made available pursuant to subsection (g) of this section."); *accord* 29 C.F.R. § 1903.11(a). The Imminent Danger Complaint detailed many of the hazards above and explained how they have facilitated the spread of COVID-19 in the Plant, including by Maid-Rite placing workers still recovering from the virus on the line and refusing to inform every worker who worked in close proximity to a person who had tested positive that they may have been exposed. *See* Ex. 2-A (Plaintiffs' Imminent Danger Complaint).

12.     Upon receiving notice of an imminent danger, the OSH Act provides that OSHA *shall* respond in one of two ways: (1) "If upon receipt of such notification the Secretary determines there are reasonable grounds to believe that such violation or danger exists, he *shall* make a special inspection in accordance with the provisions of this section as soon as practicable, to determine if such

5

violation or danger exists" or (2) "[i]f the Secretary determines there are no reasonable grounds to believe that a violation or danger exists he *shall* notify the employees or representative of the employees in writing of such determination." 29 U.S.C. § 657(f)(1) (emphases added); *accord* 29 C.F.R. §§ 1903.11(b), 1903.12(a).

13.    Despite this clear mandate, OSHA has neither made a special inspection nor notified the employees or their representatives in writing of a determination that there are no reasonable grounds to believe that a violation or danger exists.

14.    Since late May, Plaintiffs have repeatedly contacted the agency by phone and letter seeking more information about OSHA's investigation, including on May 27, 2020, June 1, 2020, June 2, 2020, and June 11, 2020. *See* Ex. 2 ¶¶ 5, 9, 12, 22 (Al-Khatib Decl.). On June 29, 2020, Plaintiffs also provided OSHA sworn declarations from workers at the Plant describing the conditions. *See* Ex. 2 ¶ 26 (Al-Khatib Decl.); Exs. 2-F, 2-G, 2-H (Worker Plaintiff Declarations).

15.    However, Plaintiffs have been told by phone that OSHA refuses to treat *any* complaint regarding COVID-19 as an imminent danger complaint, despite the fact that COVID-19, and Maid-Rite's practices failing to protect workers from its spread, clearly pose a "danger . . . which could reasonably be expected to cause death or serious physical harm immediately or before the imminence of such danger can be eliminated through the enforcement procedures

otherwise provided by this chapter," thus constituting an imminent danger. *See* 29 U.S.C. § 662(a).

16.     Instead of recognizing the clear imminent danger posed by COVID-19 and Maid-Rite's practices that exacerbate its spread, OSHA appears poised to ignore the facts in the Imminent Danger Complaint and treat it as implicating only garden-variety workplace hazards that can be addressed by OSHA over the course of months. During that period, OSHA intends to allow Maid-Rite's irresponsible practices to continue unabated, exposing workers to the ongoing imminent dangers of virus spread at the Plant, every single day.

17.     OSHA's seeming refusal to protect so-called essential workers— many of whom are low-wage workers, immigrants, and people of color—from the imminent dangers they face caused by Maid-Rite's failure to expend the resources necessary to protect its employees is part of a pattern. An OSHA official in Florida recently informed a worker complaining about workplace conditions that may contribute to the spread of COVID-19 within his workplace that OSHA is "not performing any inspections or any type of enforcement regarding coronavirus" at the present time.[1] Under OSHA's internal operating procedures, an OSHA

---

[1] Meghan Bobrowsky, *'OSHA is AWOL': Critics say federal agency is where workplace COVID-19 complaints go to die*, Miami Herald (July 3, 2020), https://www.miamiherald.com/news/coronavirus/article243816822.html.

inspection is a prerequisite to an enforceable OSHA action. *See Rural Cmty. Workers All. v. Smithfield Foods, Inc.,* No. 5:20-cv-06063-DGK, Dkt. No. 35-4 ¶ 15 (W.D. Mo.) (Declaration of David Michaels, Assistant Secretary for OSHA 2009-2017); *id.* Dkt. No. 35-5 ¶ 14 (Declaration of Anne Rosenthal, managing attorney Office of the United States Solicitor of Labor, Division of Occupational Safety and Health, 1988-2018).

18.     But this Complaint is not about OSHA's failures across the country. It is about the dozens of workers at the Plant in Dunmore who are confronting a consistent imminent danger.

19.     The law requires the Secretary, through OSHA, to act promptly to hold Maid-Rite accountable and to protect workers including by obtaining a court "order issued under this section [to] require such steps to be taken as may be necessary to avoid, correct, or remove such imminent danger" prior to a formal OSHA citation. 29 U.S.C.A. § 662(a).

20.     But OSHA continues to signal to Maid-Rite that it need not change its behavior and to Maid-Rite workers that the imminent risks to their lives posed by Maid-Rite's misconduct do not give cause for urgent action.

21.     While an agency's enforcement decisions are typically insulated from judicial review, *see Heckler v. Chaney*, 470 U.S. 821 (1985), Congress made a different trade-off when it enacted the Occupational Safety and Health Act ("OSH

Act"), 29 U.S.C. § 651, *et seq.* Because of the critical importance of ensuring that workplace protections against imminent workplace dangers are enforced promptly, even in the absence of a private cause of action under the Act, Congress provided a distinct mechanism in 29 U.S.C. § 662(d), which allows workers or their representatives to "bring an action against the Secretary . . . for a writ of mandamus to compel the Secretary to seek such an order [under § 662(a)] and for such further relief as may be appropriate."

22.     Plaintiffs have done everything else they can do to bring the dangers at issue to OSHA's attention: they have filed an administrative complaint, they have called, they have written letters and submitted new declarations. In seeking OSHA's attention, they also have the benefit of an administrative complaint filed by another worker *months* earlier complaining of the same conditions. Plaintiffs cannot wait any longer for OSHA to act. Pursuant to the mechanism Congress created for the express purpose of situations like the one before the Court here, they respectfully request that this Court order the Secretary, through OSHA, to obtain immediate relief from the imminent dangers the Worker Plaintiffs and their coworkers face every day they report to work.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this matter is brought under the Occupational Health and Safety Act, 29 U.S.C.

§ 662(d). 28 U.S.C. § 1361 also provides district courts jurisdiction over

mandamus actions like this one against officers and employees of the United

States.

24.     Venue is proper because a substantial part of the events giving rise to

the claims set forth herein occurred in this District and the imminent danger is

alleged to exist in this District.

## PARTIES

25.     Jane Does I, II, and III ("Worker Plaintiffs") are workers at the Plant.

26.     Jane Doe I is a current employee at Maid-Rite and has worked at the

Plant for more than 10 years.

27.     Jane Doe I packages raw hamburger meat into containers to be sold to

consumers.

28.     With Justice at Work as her representative, Jane Doe I, with Jane Doe

II, provided facts for the Imminent Danger Complaint filed anonymously on their

behalf with OSHA on May 19, 2020.

29.     On June 25, 2020, Jane Doe I signed an anonymous written

declaration that Justice at Work sent to OSHA in which she detailed ongoing

hazards that posed an imminent danger to her and other workers.

30.     Jane Doe I remains concerned about her safety while working at the

Plant. However, she wishes to remain anonymous for fear of retaliation.

31.     Jane Doe II is a current employee at Maid-Rite and has worked at the Plant for more than 10 years.

32.     Jane Doe II packages raw meat into containers to be sold to consumers.

33.     With Justice at Work as her representative, Jane Doe II, with Jane Doe I, provided facts for the Imminent Danger Complaint filed anonymously on their behalf with OSHA on May 19, 2020.

34.     On June 25, 2020, Jane Doe II signed an anonymous written declaration that Justice at Work sent to OSHA in which she detailed ongoing hazards that posed an imminent danger to her and other workers.

35.     Jane Doe II remains concerned about her safety while working at the Plant. Indeed, Jane Doe II contracted COVID-19, which she believes resulted from her work at the Plant. However, she wishes to remain anonymous for fear of retaliation.

36.     Jane Doe III is a current employee at the Plant and packages raw hamburger meat into containers to be sold to consumers.

37.     On June 25, 2020, Jane Doe III signed an anonymous written declaration that Justice at Work sent to OSHA in which she detailed ongoing hazards that posed an imminent danger to her and other workers.

38.     In its letter to OSHA on June 29, 2020, Justice at Work informed

OSHA that it represents Jane Doe III and was submitting an anonymous written declaration on her behalf.

39.     Jane Doe III contracted COVID-19, and she believes she contracted the virus while working at the Plant.

40.     Jane Doe III continues to be concerned about her safety while working at the Plant, but she wishes to remain anonymous for fear of retaliation.

41.     Justice at Work is a non-profit legal organization based in Pennsylvania.

42.     Justice at Work has been designated by the Worker Plaintiffs to serve as their representative for the purposes of filing an OSHA complaint and filing this action pursuant to 29 U.S.C. § 662(d) (allowing for "the representative of such employees" to file such an action). *See* Ex. 3 (Redacted Worker Designations). According to OSHA's regulations, a "representative" is "any person, including an authorized employee representative, authorized by a party or intervenor to represent him in a proceeding." 29 C.F.R. § 2200.1(h).

43.     Defendant Eugene Scalia is the United States Secretary of Labor and head of the department of which OSHA is a part.  Defendant Eugene Scalia is sued in his official capacity.

44.     Defendant the Occupational Safety and Health Administration is the congressionally established agency intended to ensure "safe and healthful working

conditions." 29 U.S.C. § 651(b). It is part of the Department of Labor that Eugene Scalia heads.

## LEGAL BACKGROUND

### A. <u>OSHA's Mandate to Protect Workers from Imminent Dangers in the Workplace</u>

*The OSH Act*

45.     The OSH Act prescribes a comprehensive enforcement scheme that includes OSHA's authority to inspect and investigate workplaces. 29 U.S.C. § 657.

46.     Additionally, OSHA is empowered to issue citations to employers where, "upon inspection or investigation," OSHA believes that the OSH Act or any standard, rule, or order promulgated under it has been violated. 29 U.S.C. § 658.

47.     An inspection can lead to a citation against the employer, which is the bulk of OHSA's enforcement authority.

48.     This process, however, can last many months and then is subject to an appeals process that can last years, during which the employer need not respond to the citation. *See* 29 U.S.C. §§ 658(c), 659(c).

49.     Recognizing the grave and urgent threats sometimes posed to the lives of workers by unsafe working conditions, the OSH Act also gives OSHA the authority to protect workers promptly by petitioning a district court "to restrain any conditions or practices in any place of employment which are such that a danger

exists which could reasonably be expected to cause death or serious physical harm immediately or before the imminence of such danger can be eliminated through the enforcement procedures otherwise provided by this chapter." 29 U.S.C. § 662(a).

50.     Further, recognizing the possibility that OSHA may not always act quickly enough to protect workers from imminent workplace dangers, § 662 also provides a mechanism for employees and their representatives to bring an action in court to force OSHA to address imminent harms. Where the Secretary, through OSHA, "arbitrarily or capriciously fails to seek relief under [§ 662], any employee who may be injured by reason of such failure, or the representative of such employees, might bring an action against [OSHA] . . . for a writ of mandamus to compel the Secretary to seek such an order and for such further relief as may be appropriate."

51.     Plaintiffs avail themselves of that mechanism here.

*OSHA's Policies for Responding to Imminent Danger Complaints*

52.     Recognizing the importance of acting promptly to address imminent dangers in the workplace, the OSH Act, OSHA's regulations, and OSHA's Field Operations Manual (the "Manual") spell out procedures for responding to complaints regarding imminent dangers. *See* Dep't of Labor, *Imminent Danger Situations*, OSHA Field Op. Man., Ch. 11 (April 14, 2020), available at https://www.osha.gov/enforcement/directives/cpl-02-00-164/chapter-11.

14

53.     The Manual defines imminent danger as those hazards that can cause
"[d]eath or serious harm", where the serious harm is "to such a degree as to shorten
life or be immediately dangerous to life and health . . . or [a] substantial reduction
in physical or mental efficiency or health, even though the resulting harm may not
manifest itself immediately." Dep't of Labor, *Imminent Danger Situations*, OSHA
Field Op. Man., Sec I(A), Ch. 11 (April 14, 2020); *accord* 29 U.S.C. § 662(a)
(describing an "imminent danger" as "a danger . . . which could reasonably be
expected to cause death or serious physical harm immediately or before the
imminence of such danger can be eliminated through the enforcement procedures
otherwise provided by this chapter").

54.     The Manual also spells out in detail what OSHA should do when it
receives a complaint of an imminent danger. Where an OSHA Area Director
receives such a complaint, "[e]very effort will be made to conduct [an] imminent
danger inspection on the same day that the report is received. In any case, the
inspection will be conducted no later than the day after the report is received."
Dep't of Labor, *Imminent Danger Situations*, OSHA Field Op. Man., Sec
I(B)(1)(b), Ch. 11 (April 14, 2020).

55.     Elsewhere the Manual reiterates that "[e]very imminent danger
inspection will be conducted as expeditiously as possible." *Id.* at I(C)(2)(a); *accord*
29 U.S.C. § 657(f)(1) (mandating that the Secretary conduct an inspection "as soon

15

as practicable" unless the Secretary has informed the workers in writing of a

determination that "there are no reasonable grounds to believe that a violation or

danger exists").

56.     In the rare case "[w]hen an immediate inspection cannot be made, the

Area Director or designee will contact the employer and obtain as many pertinent

details as possible about the situation, and attempt to have any employee(s)

affected by the imminent danger voluntarily removed." Dep't of Labor, *Imminent*

*Danger Situations*, OSHA Field Op. Man., Sec I(B)(1)(c), Ch. 11 (April 14, 2020).

57.     Even in this context, where an immediate inspection is not possible,

the Manual is clear that OSHA shall act immediately, in conjunction with the

employer, to address the subjects of the imminent danger. In a case where OSHA

is unable to conduct an immediate inspection, OSHA shall obtain "[a] record of

what steps, if any, the employer intends to take in order to eliminate the danger."

*Id.*; *see also* 29 C.F.R. § 1903.6(a)(1) (identifying "cases of apparent imminent

danger" as a rare instance in which the employer may be notified of an inspection

in advance "to enable the employer to abate the danger as quickly as possible").

58.     If, upon inspection, OSHA discovers an imminent danger that the

employer refuses to remove voluntarily, then the "Area Director or designee and

the Regional Administrator, in consultation with the [Regional Solicitor of Labor],

will assess the situation and, if warranted, make arrangements for the expedited

initiation of court action, or instruct the CSHO to remove the *Notice of an Alleged Imminent Danger*." Imminent Danger Situations., Dep't of Labor, *Imminent Danger Situations*, OSHA Field Op. Man., Sec I(D(2)(e), Ch. 11 (April 14, 2020); *see also* 29 U.S.C. § 662(a) (allowing the Court to review a petition from the Secretary to restrain imminent dangers).

## B. OSHA's Response to COVID-19

*OSHA's Stated Enforcement Policies for Responding to Complaints Regarding Workplace Hazards During the COVID-19 Pandemic*

59. Throughout the COVID-19 pandemic, OSHA has provided specific guidance regarding its enforcement priorities, as well as actions employers should take to mitigate hazards associated with the disease.

60. Most recently, on May 19, 2020, new guidance went into effect that stated one of OSHA's top priorities is "[e]liminating hazards from COVID-19." *See* OSHA Memorandum, *Updated Interim Enforcement Response Plan for Coronavirus Disease 2019 (COVID-19)*, May 19, 2020, https://www.osha.gov/memos/2020-05-19/updated-interim-enforcement-response-plan-coronavirus-disease-2019-covid-19 ("May 19 Guidance").

61. The May 19 Guidance establishes an enforcement framework under which enforcement strategies vary to some degree based on the level of community spread in the region where the employer operates. Under the May 19 guidance

OSHA will prioritize its onsite inspection resources in "areas experiencing sustained elevated community transmission or a resurgence in community transmission of COVID-19." But whether or not the geographic area at issue has experienced a decreased or resurgent community spread of COVID-19, the May 19 Guidance provides that OSHA will prioritize inspections related to COVID-19, with a particular focus on "imminent danger exposures," high-risk workplaces such as hospitals and other healthcare providers, and workplaces where there have been a "high number of complaints."

62.     Under the May 19 Guidance, Meatpacking workers are considered to hold "medium exposure risk" jobs—as opposed to health care workers who are the only workers considered to hold "high and very high exposure risk" jobs. The May 19 Guidance notes that some complaints regarding "medium exposure risk" jobs "might not result in an on-site inspection, depending on the discretion of the [Area Director] where non-formal procedures can sufficiently address the alleged hazards." However, under the May 19 Guidance, no matter the risk level of the occupation, "fatalities and imminent danger exposures related to COVID-19 will be prioritized for inspections."

63.     Where onsite inspections are not possible or imprudent because of resource limitations, the May 19 Guidance provides that OSHA may use informal investigative tools and so-called "rapid response investigations" ("RRIs").

18

Elsewhere, OSHA has stated that a key component of an RRI is an employer's

verification, within five days of the initiation of the RRI, that the employer has

"completed corrective action."[2] *See also* May 19 Guidance ("Where limitations on

resources are such that neither an on-site or remote inspection is possible, OSHA

will investigate [reported fatalities or imminent dangers] using a rapid response

investigation (RRI) to identify any hazards, provide abatement assistance, and

*confirm* abatement." (emphasis added)).

*OSHA Is Empowered To Protect Workers from COVID-19*

64.     While OSHA has not promulgated any standard, including any

emergency temporary standard pursuant to 29 U.S.C. § 655(c)(1), regarding the

transmission in the workplace of the virus that causes COVID-19, OSHA can also

protect workers under its "general duty" clause. The OSH Act provides that in

addition to complying with specific workplace standards, employers must, and

OSHA can require employers to, "furnish to each of [their] employees employment

and a place of employment which are free from recognized hazards that are

causing or are likely to cause death or serious physical harm to his employees." 29

---

[2] OSHA Memorandum, Revised Interim Enforcement Procedures for Reporting Requirements Under 29 C.F.R. 1904.39 (Mar. 4, 2020), https://www.osha.gov/memos/2016-03-04/revised-interim-enforcement-procedures-reporting-requirements-under-29-cfr-190439.

U.S.C. § 654(a).

65.     OSHA has expressly stated its authority under the "general duty" clause allows it to protect workers from workplace conditions that may contribute to the spread of COVID-19.

66.     In response to a petition for a writ of mandamus to the United States Court of Appeals for the D.C. Circuit to force OSHA to promulgate an emergency temporary standard regarding the transmission of infectious diseases, including COVID-19, OSHA reassured the Court that the "general duty" clause is sufficient to protect workers. In briefing in that matter, OSHA noted that OSHA itself, along with the CDC and other state and local agencies, have issued guidance "demonstrat[ing] feasible methods employers may use" to protect against the spread of COVID-19 in the workplace. "An employer that fails to abate [the hazard of potential exposure to COVID-19] may be liable for violating the general duty clause" if the employer fails to implement such feasible methods for mitigating the risk of exposure in the workplace. Dep't of Labor Br. at 26, *In re: Am. Fed'n of Labor & Cong. of Indus. Organizations*, No. 20-1158 (D.C. Cir. May 29, 2020).

67.     In rejecting the mandamus petition, the D.C. Circuit relied in part on "the regulatory tools that OSHA has at its disposal" even in the absence of an emergency temporary standard, namely the "general duty" clause. *In re: Am. Fed'n of Labor & Cong. of Indus. Organizations*, No. 20-1158, 2020 WL 3125324, at *1

(D.C. Cir. June 11, 2020); *see also* News Release, Dep't of Labor, U.S.

Department of Labor Statement on D.C. Circuit Court Ruling (June 11, 2020),

https://www.dol.gov/newsroom/releases/osha/osha20200611-0 ("We are pleased

with the decision from the D.C. Circuit, which agreed that OSHA reasonably

determined that its existing statutory and regulatory tools are protecting America's

workers and that an emergency temporary standard is not necessary at this time.

OSHA will continue to enforce the law and offer guidance to employers and

employees to keep America's workplaces safe.").

*OSHA Has Identified What Constitutes Imminent Dangers at Meatpacking Plants and What Steps Are Required to Mitigate Them*

68.     OSHA knows what is required to keep workers safe at meatpacking

plants. Recognizing that COVID-19 can cause people to "be admitted to the

hospital, and some people may die from the illness" and the "[m]ultiple outbreaks

of COVID-19 among meat and poultry processing facility workers [that] have

occurred in the United States recently," OSHA, in conjunction with the CDC, has

issued specific guidance to meatpacking employers regarding methods for reducing

the spread of the virus that causes COVID-19 among workers in meatpacking

plants. *See* Interim Guidance from CDC and the Occupational Safety and Health

Administration (OSHA), *Meat and Poultry Processing Workers and Employers*,

https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/meat-

poultry-processing-workers-employers.html ("OSHA Meatpacking Guidance").

69.     The OSHA Meatpacking Guidance identifies the substantial risks of COVID-19 transmission among workers in meatpacking facilities and explains that "the preferred approach [for employers] is to eliminate a hazard or processes [that contribute to the spread of the virus]; install engineering controls [to mitigate risks of the spread of the virus]; and implement appropriate cleaning, sanitation, and disinfection practices to reduce exposure or shield workers."

70.     Among the relevant workplace and human resources changes recommended in the OSHA Meatpacking Guidance are the following:

71.     **Providing Personal Protective Equipment**: The OSHA Meatpacking Guidance recommends that employers *provide* workers with masks and face shields, including cloth face coverings. Indeed, it instructs that "Employers who determine that cloth face coverings should be worn in the workplace, including to comply with state or local requirements for their use, should ensure the cloth face coverings" meet a variety of requirements that can *only* be satisfied if the employer has control over the face coverings.

72.     **Spacing Workers on Production Lines**: The OSHA Meatpacking Guidance emphasizes the importance of making changes to production lines where meatpacking workers are frequently forced to work shoulder to shoulder for seven or more hours every day. The Guidance notes that the forced close proximity of

22

meatpacking workers "may contribute substantially to their potential exposures."

73.     Most importantly, the OSHA Meatpacking Guidance recommends "modifying the alignment of workstations, including along processing lines, if feasible, so that workers are at least six feet apart in all directions (e.g., side-to-side and when facing one another)." To this end, employers "should modify the alignment of workstations so that workers do not face one another."

74.     A diagram included in the OSHA Meatpacking Guidance clearly indicates that workers should not be forced to work within six feet of each other along production lines, regardless of whether the employer provides physical barriers between workers on the line.[3] That diagram is included below.

---

[3] Notably, Maid-Rite has not added physical barriers between workstations at all. If they did, additional measures would still be necessary. A memo issued by officials from the Centers for Disease Control and Prevention and the South Dakota Department of Health makes clear that "[b]arriers should be used in combination with (and not replace) other social distancing, hand hygiene, and personal protective equipment efforts outlined in these recommendations, wherever feasible." Department of Health Memorandum, *Strategies to Reduce COVID-19 Transmission at the Smithfield Foods Sioux Falls Pork Plant* (Apr. 22, 2020), https://covid.sd.gov/docs/smithfield_recs.pdf..

23



75.     OSHA explains that workers must be able to distance in other areas of the plants as well. To promote social distancing, employers should "[s]tagger break

times or provide temporary break areas and restrooms to avoid groups of workers

during breaks. Workers should maintain at least six feet of distance from others at

all times, including breaks."

76.     The OSHA Meatpacking Guidance observes that these

recommendations must be implemented only where "feasible," but it also notes

that the feasibility analysis does not turn on whether or not a particular change

would be consistent with current practices. Rather the Guidance states that

"[c]hanges in production practices may be necessary in order to maintain

appropriate distances among workers."

77.     **Providing Adequate Opportunities for Personal Hygiene**: The

OSHA Meatpacking Guidance also recognizes the importance of providing

adequate opportunities for personal hygiene during the workday. Under the

Guidance, employers should provide workers with access to handwashing facilities

and meaningful opportunities to use those facilities, which could include

"providing additional short breaks into staff schedules to increase how often staff

can wash their hands with soap and water or use hand sanitizers with at least 60%

alcohol."

78.     **Altering Incentive and Leave Policies**: The OSHA Meatpacking

Guidance further recognizes the importance of ensuring that workers are not

coming into the workplace while experiencing symptoms of COVID-19. The

25

Guidance recommends that employers (1) "[a]nalyze sick leave policies and consider modifying them to make sure that ill workers are not in the workplace," and (2) "[a]nalyze any incentive programs and consider modifying them, if warranted, so that employees are not penalized for taking sick leave if they have COVID-19." The Guidelines further provides "If a worker is confirmed to have COVID-19, employers should inform anyone they have come into contact with (including fellow workers, inspectors, graders, etc.) of their possible exposure" so that those who may have been exposed can self-quarantine under the new sick leave policies as appropriate.

79.     **Changing Work Schedules to Minimize Exposure**: Additionally, the OSHA Meatpacking Guidance urges employers to minimize the number of workers potentially exposed to the virus by "cohorting workers," in other words "by making sure that groups of workers are always assigned to the same shifts with the same coworkers." "Cohorting may reduce the spread of workplace SARS-CoV-2 transmission by minimizing the number of different individuals who come into close contact with each other over the course of a week."

## FACTUAL ALLEGATIONS

**A. The Maid-Rite Facility Presents an Imminent Danger to Workers, and that Danger Can be Promptly Mitigated if OSHA Requires Maid-Rite To Make Minor Adjustments to Its Operations**

80.     Since the beginning of March, the Plant in Dunmore, Pennsylvania

has presented an extraordinary and imminent danger to those who work there.

81.    Many workers at the Plant—as many as half, according to the Worker Plaintiffs' estimates—have already contracted COVID-19.  *See also* Ex 1 at 40 (April Complaint).

82.    Intermittently, since the beginning of March, workers at the Plant have complained to their bosses and to OSHA about several significant breaches of Maid-Rite's general duties to its workers and of OSHA's Meatpacking Guidance.

83.    For instance, Maid-Rite does not provide workers with appropriate equipment. While workers are required to wear facemasks, workers must supply their own cloth facemasks, except on ***three*** occasions over the past several months when Maid-Rite has supplied workers with thin masks.

84.    During the course of the pandemic and continuing to this day, Maid-Rite has also forced workers to work shoulder-to-shoulder on its production line, sometimes touching elbows with the workers on their left and right as they process meat along the Plant's production lines.

85.    Meanwhile, workers *also* stand approximately three to four feet away from the workers working on the opposite side of the production line.

86.    While workers are able to space themselves along the lines when lines are slowed—either through reducing the lines' rotations or spacing meat out on the line—Maid-Rite has maintained pre-pandemic line speeds during the COVID-19

pandemic. Occasionally, Maid-Rite slows the lines for reasons unrelated to safety

and social distancing. When it does so, the workers are better able to space

themselves. However, most often, Maid-Rite continues to run the Plant in ways

that prevent workers from social distancing—maintaining the rate at which meat

must be cut and thus the number of workers who must be on the line—just as

before the pandemic.

87.     Dr. Melissa Perry—Professor and Chair of Environmental and

Occupational Health at the Milken Institute School of Public Health of the George

Washington University, in Washington, D.C. who has published six peer-reviewed

scientific journal articles on worker health and safety at slaughterhouses and

meatpacking facilities—has explained that companies could easily make these

adjustments if companies merely accept they may need to produce less meat during

the pandemic. Declaration of Dr. Melissa Perry, *Rural Cmty. Workers All. v.*

*Smithfield Foods, Inc.,* No. 5:20-cv-06063-DGK, Dkt. No. 35-2 ¶¶ 12-13 (W.D.

Mo.).

88.     Yet Maid-Rite has not even placed markings on the floors to indicate

that workers should try to socially distance along the lines.

89.     Because of the breakneck pace of the production line, workers also do

not have time to wash their hands, apart from designated breaks.

90.     Maid-Rite has not provided for relief workers to allow workers to

rotate off the line, and does not provide workers with additional opportunities to wash or sanitize their hands while working. Maid-Rite has not provided workers with additional handwashing or sanitizing stations, nor has Maid-Rite provided additional break times for workers to wash or sanitize their hands.

91.    This means that during Plant workers' regular 8.5 hour shifts, the workers are able to wash or sanitize their hands only during their three breaks during the workday, one of which is their lunch break.

92.    And in order to wash their hands during breaks, workers must enter one of the Plant's few bathrooms where they have no choice but to crowd together.

93.    Again Dr. Perry has explained, "If a plant slows the line to allow for social distancing, as it must, then it will be able to use its existing workforce to rotate workers on and off the line. In other words, with less workers on the line, there will be more replacement workers, allowing for regular breaks. Those breaks will ensure proper self-care" and less crowding when that self-care occurs. Perry Decl., *supra* ¶ 19.

94.    Throughout the course of the pandemic, and continuing through today, Maid-Rite has incentivized workers to report to work even when they are experiencing symptoms of COVID-19. This is especially problematic because Maid-Rite also fails to inform all workers in close proximity to a worker suffering from the virus that they may have been exposed, turning the Plant into an incubator

for the spread of the disease into the community.

95.     Moreover, Maid-Rite provides a special bonus to its workers who work on weekends during the pandemic; that bonus is not available to workers who miss work—even if they are missing work due to being sick. In direct conflict with public health guidance and OSHA's Meatpacking Guidance, Maid-Rite is encouraging workers to attend work while sick.

96.     Maid-Rite also continues to follow its pre-pandemic policy of issuing workers disciplinary points for calling out sick. Under the company's point system for disciplining workers, if a worker accrues more than six points, he or she may be subject to termination.  This system also encourages workers to attend work while sick.

97.     Here too, Dr. Perry states, "by slowing the line, the plants will be able to alter their pay structure and leave policies to ensure that sick workers are sent home and workers are compensated for time out while they are sick." Perry Decl., *supra* ¶ 20.

98.     Finally, far from "cohorting" workers, Maid-Rite does not even use the same set of workers every day. Instead, Maid-Rite sometimes brings groups of workers from other affiliated facilities to work alongside the Plant's everyday workers. This means that even if every single worker who works at the Plant every day manages to protect him or herself from contracting the virus outside of work,

he or she could still be exposed to the virus at work by workers coming from other facilities.

99.     Every day that goes by without the Plant being forced to comply with basic public health guidance, including the most fundamental recommendations of the OSHA Meatpacking Guidance, is another day that additional workers are put in imminent danger of contracting the virus.

100.    In April, when the first worker filed his or her complaint against Maid-Rite, the Plant was experiencing a widespread outbreak that impacted many workers and their families at the Plant.

101.    At other meatpacking plants around the country and the world, when employers have not altered their practices, COVID-19 outbreaks have quickly spread among hundreds of workers in a single plant.[4] Those outbreaks have in turn

---

[4] *See, e.g.*, Shelly Bradbury, *How Coronavirus Spread Through JBS's Greeley Plant*, Denver Post (July 12, 2020), https://www.denverpost.com/2020/07/12/jbs-greeley-coronavirus-investigation/; Jessica Lussenhop, *Coronavirus at Smithfield Pork Plant: The Untold Story of America's Biggest Outbreak*, BBC News (April 17, 2020), https://www.bbc.com/news/world-us-canada-52311877; *see also* EFFAT Report, *Covid-19 Outbreaks in Slaughterhouses and Meat Processing Plants: State of Affairs and Proposals for Policy Action at EU Level*, Eur. Fed'n of Food Agric. and Tourism Trade Unions (June 30, 2020) at 6, available at https://effat.org/wp-content/uploads/2020/06/EFFAT-Report-Covid-19-outbreaks-in-slaughterhouses-and-meat-packing-plants-State-of-affairs-and-proposals-for-policy-action-at-EU-level-30.06.2020.pdf (describing the factors that have contributed to spread in the meat industry in Europe, including lack of social distancing, lack of inspections, and poor ventilation).

fueled community-wide surges.[5]

102.    Considering the recent uptick of COVID-19 cases around the country, which has correlated with an increased rate of spread in Lackawanna County since the middle of June,[6] it is increasingly likely that a worker employed by Maid-Rite or someone else who regularly enters the Plant will become sick with COVID-19.

103.    Because of Maid-Rite's human resources practices, which include incentivizing workers to attend work when sick, failing to inform workers about the risk of exposure, and intermingling workers from several facilities, there is a special danger that a Maid-Rite worker who contracts COVID-19 will attend work when sick. And considering the current conditions at the Plant, even a single worker attending work with COVID-19 is likely to fuel another outbreak among Maid-Rite workers that would cause serious injury and death.[7]

104.    Maid-Rite's breaches of its duties to protect its workers from COVID-19 constitute an imminent danger that OSHA is required to address. *See* 29 U.S.C.

---

[5] *See, e.g.*, *U.S. Coronavirus Hotspots Linked to Meat Processing Plants*, The Guardian (May 15, 2020), https://www.theguardian.com/world/2020/may/15/us-coronavirus-meat-packing-plants-food.

[6] COVID-19 Data for Pennsylvania, https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx.

[7] *See, e.g.*, Perry Decl., *supra* ¶ 10 ("Without social distancing, it is my expert opinion that the spread of COVID-19 in slaughterhouses and meat packing plants is inevitable and they will be forced to shutter.")

§ 662(a). Additionally, such harm can occur any day, and certainly before the danger can be "eliminated through the enforcement procedures otherwise provided" under the OSH Act. *Id.* OSHA can take up to six months to issue a citation and once issued the employer can appeal, which stays the effect of the citation, potentially for up to a decade. *Id.* § 658(c), 659(c).

105.   Therefore, OSHA should have sought an interim order pursuant to 29 U.S.C. § 662(a).

**B. <u>OSHA Has Failed to Address Imminent Dangers at the Plant</u>**

106.   OSHA has been on notice of the imminent dangers at the Plant since as early as April 9, 2020. On that date, a worker who is not a party to this Complaint or represented by Justice at Work filed an administrative complaint with OSHA asserting that workers tested positive for COVID-19, that the facility was not sanitizing sufficiently to protect workers, that workers were not provided gloves and masks, and that employees could not maintain social distancing while accomplishing their work. Ex 1 at 39-40 (April Complaint).

107.   That complaint raised, in heart-wrenching terms, the urgency of the threat facing the workers employed at the Maid-Rite facility. The complainant, whose identity is not known to Plaintiffs, stated: "About half the plant is out sick they hire more people and not taking care of the problem people keep coming n going getting sick there not cleaning not taking precautions of a pandemic illness

I'm scared to go to work everyday I'm risking my life today on april 9 I was givin a mask for the first time it's sad and scary I'm sorry." Ex. 1 at 40 (April Complaint).

108.    In response to that complaint, OSHA never conducted an inspection. Indeed, OSHA conveyed to Maid-Rite in an April 9, 2020 letter that OSHA did "not intend to conduct an inspection at [that] time." Ex. 1 at 30 (OSHA's May 9 Letter to Maid-Rite).

109.    All OSHA did was request that Maid-Rite investigate the circumstances of the complaint, "make any necessary corrections or modifications," and respond to OSHA within a week explaining the results of the investigation and a description of any such corrections. *Id.* OSHA did not provide any additional guidance on what kinds of corrections or modifications may have been necessary.

110.    In Maid-Rite's response to OSHA's notice of the complaint, Maid-Rite provided patently incomplete and inadequate explanations respecting the allegations at issue. For example, with respect to the allegations regarding inadequate social distancing, Maid-Rite asserted that "[t]he structure of Maid-Rite's production line does not always permit employees to stand six feet apart." Ex 1 at 3 (Maid-Rite Response). Maid-Rite did not explain why it would not be feasible to situate employees more than six feet apart even if, as suggested by the

34

OSHA Meatpacking Guidance, it made changes in "production practices." Maid-Rite even failed to suggest it was spacing workers where it declared that was "permissible."

111.  With respect to complaints regarding inadequate gear, Maid-Rite asserted that it had procured and issued masks after OSHA suggested that masks were recommended, but Maid-Rite never explained whether it would be providing masks daily to employees going forward. Ex 1 at 4 (Maid-Rite Response).

112.  Of course, had OSHA conducted an inspection, it would have discovered inadequate social distancing and that workers were not in fact being provided face coverings, sufficient breaks, or medical leave that encourages them to stay home when sick.

113.  On May 19, 2020, Plaintiffs submitted the Imminent Danger Complaint to OSHA detailing that the ongoing workplace safety and health issues in the facility constituted an "imminent danger" pursuant to 29 U.S.C. § 662. *See* Ex. 2-A (Plaintiffs' "Imminent Danger Complaint"). (the "Imminent Danger Complaint"). The Imminent Danger Complaint alleged, among other things, inadequate face coverings, inadequate social distancing inadequate handwashing, Maid-Rite's continuing to incentivize workers to attend work while sick, and Maid-Rite failed inform workers of their risk of exposure. Such practices had already contributed to the spread of COVID-19.

35

114. The next day, a paralegal from Justice at Work's office confirmed that the OSHA Wilkes-Barre area office received the Imminent Danger Complaint.  Ex. 2 ¶ 4 (Al-Khatib Decl.).

115. On May 27, 2020, Justice at Work faxed a follow-up letter to the OSHA Wilkes-Barre office, as it had not received a response from OSHA. Justice at Work expressed concern in that letter that OSHA was not taking immediate steps to address the Imminent Danger Complaint and referred to OSHA's May 19, 2020 Updated Interim Enforcement Response Plan for Coronavirus Disease 2019 (COVID-19). Justice at Work asked that all communications be sent via email to avoid delays in mailing and faxing.

116. On May 28, 2020, Alia Al-Khatib, an attorney with Justice at Work, spoke with Assistant Area Director Susan Giguere in response to Justice at Work's May 27, 2020 letter. Ms. Giguere stated that OSHA sent Justice at Work's office a letter in response to the Imminent Danger Complaint and that such complaints are handled the day they are received.

117. Ms. Giguere stated that the Imminent Danger Complaint was being considered as a "non-formal" complaint, without explaining why.

118. Also without explanation, OSHA seemingly did not treat the Imminent Danger Complaint as an imminent danger complaint. Ex. 2 ¶ 11 (Al-Khatib Decl.).

119.   Later that same day, Justice at Work's office received the letter sent via regular mail from OSHA Area Director Mark Stelmack dated May 21, 2020 in which Mr. Stelmack stated OSHA was treating the Imminent Danger Complaint as a "non-formal complaint." The letter stated that Maid-Rite had been given 5 days to correct the hazards documented in the Imminent Danger Complaint. The letter further stated, "Please notify [OSHA] if no correction has been made by May 28, 2020." Ex. 2-B (OSHA's May 21 Letter to Plaintiffs).

120.   On June 1, 2020, Ms. Al-Khatib called Assistant Area Director Giguere to inform her that Jane Does I and II had informed Justice at Work that Maid-Rite had made no changes to workplace conditions since the Imminent Danger Complaint was filed. Ms. Giguere informed Ms. Al-Khatib that the company sent a letter to OSHA regarding the Imminent Danger Complaint, but that OSHA would not send the response to Justice at Work to review. Ms. Giguere stated that the next step would involve either an onsite inspection or further inquiry with the company. When asked why the Imminent Danger Complaint was treated as "non-formal," Ms. Giguere explained it was because all complaints in counties under so-called "red zone" orders because of the extent of COVID-19 spread were being treated as non-formal complaints.

121.   OSHA also stated in the June 1 phone call that OSHA could not treat the Imminent Danger Complaint as an imminent danger complaint because then

OSHA would have to treat all COVID-related complaints as imminent danger complaints. Ex. 2 ¶ 11 (Al-Khatib Decl.).

122.   On June 2, 2020, Justice at Work faxed another letter to Mr. Stelmack in which Justice at Work requested Maid-Rite's response to OSHA, which is consistent with the procedures for handling an inquiry under the Manual, Chapter 9, Section (I)(I)(6). *See* Ex. 2 ¶ 12 (Al-Khatib Decl.).

123.   In response to the letter, Ms. Giguere called to explain that Justice at Work was not entitled to the response because the inquiry had not been finalized. She informed Ms. Al-Khatib that an inspection had begun and that it could take up to six months to complete. Ms. Giguere stated that once the inspection was completed, Justice at Work could submit a FOIA request for the response. Justice at Work was not provided a date of an onsite inspection nor given any other indication of immediate action to resolve the workers' Imminent Danger Complaint.

124.   On June 3, 2020, Ms. Giguere emailed Ms. Al-Khatib to request an interview by telephone with Jane Does I, II, or III. Over the next several days, Justice at Work and OSHA engaged in back-and-forth negotiations regarding the anonymity protections that OSHA could provide Jane Does I, II, and III. *See* Ex. 2 ¶¶ 16-20 (Al-Khatib Decl.).

125.   On June 11, 2020, Ms. Al-Khatib contacted Ms. Giguere again to ask

whether OSHA had conducted an onsite inspection, as the OSHA website that details information about inspections indicated that a "closing conference" was conducted on June 2, 2020. Ms. Al-Khatib informed Ms. Giguere again that Jane Does I, II, and III stated that no changes had been made at the Plant since the Imminent Danger Complaint was submitted. Ms. Giguere responded, "On the day that an inspection is opened, an opening and closing conference is typically held. This inspection is in progress, and a response will be provided to you regarding its outcome at the conclusion of the inspection." Ex. 2 ¶ 23 (Al-Khatib Decl.). The worker Plaintiffs ultimately submitted declarations to OSHA describing the ongoing and imminent workplace dangers. *See* Exs. 2-F, 2-G, 2-H (Worker Plaintiffs Declarations).

126.   Ms. Al-Khatib called and left a message on June 12, 2020 to seek clarification. *See* Ex. 2 ¶¶ 24 (Al-Khatib Decl.).

127.   On June 29, Plaintiffs sent a letter to the OSHA office, reinforcing that all of the same conditions at the Plant that had existed when the Imminent Danger Complaint was filed continued to exist on June 29. Ex. 2-E (Plaintiffs' June 29 Letter to OSHA). Attached to the letter were declarations from Jane Does I, II, and III. Exs. 2-F, 2-G, 2-H (Worker Plaintiffs Declarations).

128.   OSHA has not yet responded to this communication. Ex. 2 ¶ 27 (Al-Khatib Decl.).

**C. OSHA's Failure to Address Imminent Dangers at the Plant Is Arbitrary and Capricious**

129.   Pursuant to 29 U.S.C. § 662(d), workers and their representatives may seek a writ of mandamus in this Court if OSHA's failure to seek relief under § 662(a) to protect workers from imminent dangers in the workplace is "arbitrary and capricious."

130.   OSHA's failure to act, pursuant to its Congressional prerogative, to protect Maid-Rite workers from the imminent dangers facing them every day they go to work is arbitrary and capricious.

131.   The arbitrary and capricious standard does not have a clear and precise definition. As courts have observed, "rather than denoting a fixed template to be imposed mechanically on every case within their ambit, [the words 'arbitrary' and 'capricious'] summon forth what may best be described as an attitude of mind in the reviewing court one that is 'searching and careful,' yet, in the last analysis, diffident and deferential." *Nat. Res. Def. Council, Inc. v. Sec. & Exch. Comm'n*, 606 F.2d 1031, 1049 (D.C. Cir. 1979) (internal citations omitted).

132.   In other contexts, to decide whether an agency's rulemaking is "arbitrary and capricious," courts examine whether the agency has looked to "factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs

counter to the evidence before the agency, or is so implausible that it could not be

ascribed to a difference in view or the product of agency expertise." *Motor Vehicle*

*Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

133.   OSHA's failure to act under § 662 to protect Maid-Rite workers from

the imminent danger of COVID-19 and Maid-Rite's practices that exacerbate that

danger meets this standard for several reasons.

134.   First, OSHA's enforcement decision runs counter to the language of

§ 662 and the agency's May 19 Guidance. The Area Director appears to have

concluded that *no* complaints related to COVID-19, no matter how severe, will be

considered "imminent danger" complaints calling for an immediate onsite

inspection that could support an action in court for injunctive relief. That is

inconsistent, however, with the language and clear purposes of § 662, which

contemplates that OSHA will take prompt action to respond to all imminent

dangers. There is no exception anywhere in that provision for situations like the

COVID-19 pandemic, where many workers across several sectors are at risk—and

there is no reason for such an exception, especially when it comes to meatpacking

workers who are among the most at risk in the country for contracting the virus at

work.

135.   The pressures on OSHA's enforcement resources are no excuse for its

failure to take prompt action at the Plant. Although the May 19 Guidance

41

recognizes that OSHA will have to prioritize some complaints over others, the Imminent Danger Complaint should have been the highest priority, even under the May 19 Guidance. *See, e.g.*, *Nat'l Mitigation Banking Ass'n v. U.S. Army Corps of Eng'rs*, No. 06-CV-2820, 2007 WL 495245, at *28 (N.D. Ill. Feb. 14, 2007) (an agency's failure to abide by its own guidance can be arbitrary and capricious). The Imminent Danger Complaint was brought by several workers and their representative regarding a workplace that had already been the subject of complaints for similar hazards during the course of this pandemic. Additionally, the Imminent Danger Complaint concerns workers who OSHA itself declares are at medium risk of exposure to the virus and who have asserted that they are the subject of an imminent danger.

136.   More specifically, the stated policy of the Area Director to treat all complaints regarding workplaces in "red zones" as non-formal, regardless of the severity of the complaint or the number of complaints regarding the same employer, explicitly conflicts with the OSH Act and OSHA's own May 19 Guidance. The OSH Act specifies that if a complaint meets the enumerated requirements of a formal complaint, OSHA *shall* respond by conducting a special inspection unless OSHA notifies the complainants in writing of a determination that "there are no reasonable grounds to believe that a violation or danger exists." 29 U.S.C. § 657(f)(1). The May 19 Guidance allows OSHA more discretion to

decline onsite inspections in regions of extensive community spread, but also expressly states that OSHA will prioritize imminent danger complaints and complaints regarding employers that are the subject of several complaints, even in locations with extensive community spread. The Complaint falls into both of those categories.

137.   Also, the stated policy of the Area Director of declining to treat *any* COVID-19 related complaints as imminent danger complaints flatly contradicts the May 19 Guidance, which expressly contemplates that there will be imminent danger complaints regarding COVID-19 and states that OSHA will prioritize those complaints for onsite inspection.

138.   The Area Director's explanations are particularly paltry as OSHA has now had months to conduct an inspection. This is especially true given that OSHA knows of the heightened risk of infection in the area. "Delays that might be altogether reasonable in the sphere of economic regulation are less tolerable when human lives are at stake . . . . This is particularly true when the very purpose of the governing Act is to protect those lives." *Pub. Citizen Health Research Grp. v. Auchter*, 702 F.2d 1150, 1157-58 (D.C. Cir. 1983) (internal citations omitted).

139.   Moreover, even in the absence of an onsite inspection, OSHA could act to ensure that Maid-Rite takes corrective action to address the imminent danger, for example, through the RRI process. However, OSHA has failed to go

even that far. Maid-Rite continues to flout OSHA's Meatpacking Guidance in several ways as consistently reported by workers in multiple complaints stretching back to early April, and OSHA allows those violations of basic workplace safety guidance to persist unabated.

140.   The multiple complaints over a period of months, continued failures on the part of Maid-Rite to take corrective action, and the fact that the Imminent Danger Complaint credibly asserts an imminent danger to workers make the complaint a high priority. And yet OSHA refuses to recognize the priority status of this Complaint or to take any other prompt action to protect workers at the Plant.

141.   OSHA's failures to act are also arbitrary and capricious because of Maid-Rite's clear violations of OSHA's Meatpacking Guidance at the Maid-Rite facility. It would take one conversation with a worker or one (unannounced) visit to the facility to see that Maid-Rite does not allow for social distancing on its production lines, that Maid-Rite intermingles workers from several facilities on any given day, that it provides insufficient protective gear, that it provides inadequate opportunities for hand washing, and that it incentivizes workers to come in sick.

142.   Given these facts, OSHA cannot provide a record of plausible reasons for foregoing enforcement. *See Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43; *Citizens to Preserve Overton Park, Inc. v. Volpe*,  401 U.S. 402, 420 (1971)

44

("Since the bare record may not disclose the factors that were considered or the Secretary's construction of the evidence it may be necessary for the District Court to require some explanation in order to determine if the Secretary acted within the scope of his authority and if the Secretary's action was justifiable under the applicable standard."). Its inaction is thus arbitrary and capricious. *See Columbia Gas Transmission Corp. v. Fed. Energy Reg. Cmm'rs*, 448 F.3d 382, 387 (D.C. Cir. 2006) (observing that "a conclusion supported 'with *no* explanation' is the epitome of 'arbitrary and capricious' decision-making (quoting *Comm'ns & Control, Inc. v. FCC*, 374 F.3d 1329, 1335-36 (D.C. Cir. 2004))).

143.   The Maid-Rite Plant is a powder keg that could go off at any moment. OSHA's own Meatpacking Guidance says so. The Secretary of Labor is required to seek an injunction to immediately protect these workers.

144.   Since he will not do so voluntarily, under the OSH Act this Court should order him to do so.

## NEED FOR EMERGENCY RELIEF

145.   The issues facing these workers are urgent. Any day, the virus could enter the facility and spread widely among workers, causing injury and even death.

146.   Therefore, Plaintiffs seek emergency relief and request an expedited briefing schedule.

## COUNT I

## 29 U.S.C. § 662

147.   Plaintiffs incorporate by reference all previous and subsequent paragraphs of this Complaint.

148.   Title 29 U.S.C. § 662(a) requires Defendants, on petition, to "restrain any conditions or practices in any place of employment which are such that a danger exists which could reasonably be expected to cause death or serious physical harm immediately . . . ."

149.   Title 29 U.S.C. § 662(a) empowers Defendants to issue any order "as may be necessary to avoid, correct, or remove such imminent danger and prohibit the employment or presence of any individual in locations or under conditions where such imminent danger exists . . . ."

150.   Despite Plaintiffs' repeated complaints and requests, Defendants have failed to restrain, abate or otherwise take corrective action of the imminent dangers set forth herein at the Maid-Rite Plant.

151.   Defendant's failures to do so have been arbitrary and capricious

152.   Therefore, Plaintiffs are entitled to an order from this Court requiring Defendants to abate the imminent danger at the Maid-Rite Plant. 29 U.S.C. § 662(d).

## PRAYER FOR RELIEF

153.   Wherefore, pursuant to 29 U.S.C. § 662(d), Plaintiffs seek an order

from this Court compelling Defendants to seek an order abating the imminent

dangers to workers at the Plant.

154.   Pursuant to 29 U.S.C. § 662(d)'s provision for all "further relief as

may be required," Plaintiffs additionally request an order mandating that

Defendants do the following:

      a.  Disclose to Plaintiffs and this Court all communications to and

         from Maid-Rite regarding this matter;

      b.  Conduct an immediate onsite inspection of the Plant; and

      c.  Engage in all other actions and proceedings necessary to resolving

         all the imminent dangers identified in this Complaint, inadequate

         personal protective equipment, including inadequate social

         distancing on production lines, insufficient opportunities to engage

         in personal hygiene, improper incentives to continue attending

         work when sick, and insufficient information about workers'

         exposure to COVID-19 at the plant.

155.   Plaintiffs request an order setting an expedited schedule for a response

to this Complaint and Petition and providing Plaintiffs an opportunity to reply.

156.   Plaintiffs also request oral argument on this Complaint and Petition as

soon as the Court deems practicable.

Respectfully submitted this 22nd day of July 2020.

47

s/Lerae Kroon, PA Bar No. 325464
Nina Menniti, PA Bar No. 326828
Samuel Datlof, PA Bar No. 324716
**FRIENDS OF FARMWORKERS, INC.,**
**D/B/A JUSTICE AT WORK**
990 Spring Garden St, Suite 300
Philadelphia, PA 19123
Telephone: (215) 733-0878
Fax: (215) 733-0878
lkroon@justiceatworklegalaid.org
nmenniti@justiceatworklegalaid.org
sdatlof@justiceatworklegalaid.org

*Attorneys for Jane Does I, II, and III*

**PUBLIC JUSTICE, P.C.**
Karla Gilbride, D.C. Bar No. 1005586
David Muraskin, D.C. Bar No. 1012451
1620 L Street NW, Suite 630
Washington, DC 20036
Telephone: (202) 797-8600
Fax: (202) 232-7203
kgilbride@publicjustice.net
dmuraskin@publicjustice.net

Adrienne H. Spiegel, CA Bar No. 330482*
475 14th Street, Suite 610
Oakland, CA 94612
Telephone: (510) 622-8207
aspiegel@publicjustice.net

**TOWARDS JUSTICE**
David H. Seligman, CO Bar No. 49394 *
Juno Turner, NY Bar No. 4491890*
Brianne Power, CO Bar No. 53730*
1410 High St., Suite 300
Denver, CO 80218
Telephone.: 720-239-2606

david@towardsjustice.org
juno@towardsjustice.org
brianne@towardsjustice.org

**NICHOLS KASTER, PLLP**
Matthew H. Morgan, MN Bar No. 304657*
Anna P. Prakash, MN Bar No. 0351362*
4600 IDS Center
80 S. Eighth Street
Minneapolis, Minnesota 55402
Telephone: (612) 256-3200
Fax: (612) 338-4878
morgan@nka.com
aprakash@nka.com

*Attorneys for Friends of Farmworkers, Inc.,
d/b/a Justice at Work*
* application for admission *pro hac vice*
forthcoming